## Patrick Cahill v. C. H. Benson et al.

Delivered April 2, 1898.

**1. Improvements in Good Faith—Knowledge of Adverse Claim.**

A purchaser of land who knows that there is a claim of title in a third person which came through a judgment against a husband and wife and a sheriff's deed thereunder, is entitled to recover for improvements made thereon, under Revised Statutes, articles 5277, 5278, on the ground that they were made in good faith, where an attorney of high standing and unquestioned integrity, after careful investigation, advised the purchaser that such claim was invalid because the land sold was the sole property of the wife, and he purchased and made the improvements in reliance thereon.

**2. Same—Charge of Court.**

See the opinion for a charge of court properly defining the law as to the claim of improvements in good faith, and for other charges thereon held properly refused.

**3. Same—Rents as Offset.**

Plaintiff can not recover rents from defendants as an offset to the latter's claim for improvements made in good faith under the statute, where the land was in a wild and uncultivated state when defendants went into possession, and had no rental value apart from the improvements made by them.

**4. Same—Rents and Improvements After Suit Begun.**

The plaintiff who in trespass to try title recovers the land and improvements, is not entitled to recover for the value of the use and occupation of the land created solely by the improvements, though some of them were placed on the land after the suit was instituted.

**5. Same—Harmless Error in Charge.**

It was harmless error for the court to submit to the jury the right of one to recover for improvements who had parted with his title, where he recovered nothing in the suit.

**6. Same—Charge of Court—Separate Tracts.**

Failure to instruct the jury to make a separate finding as to improvements on two tracts of land by defendant in trespass to try title is not ground for reversal where the two tracts formed only one inclosed tract, and no charge in reference to a separate finding as to each tract was requested.

**7. Same—Costs.**

Plaintiff in trespass to try title is properly charged with the costs of contesting an issue as to improvements on the land made by defendant in good faith, where the question as to plaintiff's title had previously been settled in his favor, and the only question at issue after a reversal is the claim for improvements and plaintiff's claim for rents, in both of which defendants are successful.

**8. Same—Statute as to Improvements Constitutional.**

The statute authorizing a recovery for improvements made by one person in good faith on land belonging to another is not in conflict with either the State or Federal Constitution.

Appeal from Dallas.   Tried below before Hon. Edward Gray.

*Dickson & Moroney,* for appellant.

*Jeff Word* and *Thompson & Thompson,* for appellee Merritt.

*Kearby & Muse,* for appellee Benson.

FINLEY, CHIEF JUSTICE.—We take the following general statement of the case, with some corrections, from appellants brief, as it is believed to be sufficiently accurate to serve the purposes designed for it:

This is the second appeal in this case. On January 10, 1894, appellant, Patrick Cahill, brought suit in the District Court of Dallas County, Texas, in trespass to try title, against C. H. Benson, Isaac Benson, Robert N. Merritt, Jim Baker, George Brown, Joel Wood, T. K. Flowers, and their respective wives (whose names are immaterial on this appeal) to recover 300 acres of land in the J. M. Hamilton survey in Dallas County, damages, and rents. J. T. Flowers had previously conveyed his interest in the property to defendant Merritt. Afterward J. T. Flowers died, and he and his wife were dismissed from the suit. On May 10, 1895, on verdict of a jury, judgment was rendered in favor of plaintiff for the land, without rents or damages, and in favor of defendants C. H. Benson, Isaac Benson, Robert N. Merritt, George Brown, and T. K. Flowers jointly for $4035, for improvements in good faith. Defendants appealed, and plaintiff filed cross assignments of error. On May 23, 1896, the appeal was decided by this court, the judgment below affirmed as to title, and, on cross-assignments of error, reversed and remanded on the issue of improvements in good faith. Benson v. Cahill, 37 S. W. Rep., 1088. The Supreme Court having refused the then appellants' application for writ of error, a mandate was issued and filed in the court below on November 18, 1896.

On December 18, 1896, plaintiff sued out a writ of sequestration, which was levied January 2, 1897, on all the land except a tract of 30 15-100 acres in the possession of the defendant George Brown, as lessee of defendant C. H. Benson (plaintiff having ratified the lease by agreement of all parties), and also except another tract of 100 acres in the possession of defendant Merritt, which he had rented from plaintiff Cahill for the season of 1897, after the judgment on appeal.

Defendants failing to replevy, plaintiff gave the statutory replevy bond on February 15, 1897, and the property sequestrated was placed in the possession of plaintiff, who thus obtained possession of all the land through the sequestration proceedings, and through defendants Brown and Merritt attorning to plaintiff as his tenants, as above stated.

The pleadings of the parties at the last trial: Plaintiff's petition was the same as on the first trial, no amendment having been since made. It was in the ordinary form of a suit in trespass to try title, and in addition, asking damages for destruction of timber, etc. (which count has never been urged, and about which no question arises), and also seek-

ing to recover for use and occupation of the property, making the usual allegations for that purpose.

C. H. Benson's fourth amended original answer, filed April 16, 1897, claimed compensation for improvements in good faith on a tract of 150 acres, and a tract of 21½ acres of the 300 acres in controversy, making voluminous allegations in support of his claim. In a separate count he claimed damages, actual and exemplary, for the sequestration of the property by plaintiff. A demurrer to this count was afterward sustained, and it was thus finally disposed of.

T. K. Flowers and R. N. Merritt's fourth amended original answer, filed April 16, 1897, claimed compensation for improvements in good faith on the 100 acres in Merritt's possession, as before stated, and also on a 50-acre tract adjoining thereto, including the 21½ acres embraced in Benson's claim. Voluminous allegations were likewise made in support of this claim. It was alleged that an undivided one-half interest in the 300 acres had been conveyed jointly to T. K. Flowers and J. T. Flowers and R. N. Merritt; that afterward this 150 acres was set aside to them in a voluntary partition with C. H. Benson, who had purchased the other 150 acres undivided interest; that afterward the 150 acres so set aside to them was again partitioned, giving each 50 acres in severalty, each tract being fully described; that afterward J. T. Flowers and wife conveyed his 50 acres to Merritt, whereby Merritt acquired 100 acres.

Volney Caldwell's original plea of intervention, filed April 16, 1897, alleged that in the sale from J. T. Flowers and wife to Merritt certain vendor's lien notes were given, of which intervener had become owner. He prayed that in the event Merritt should recover on his claim for improvements on this 50 acres he should be subrogated to Merritt's rights so far as necessary to his protection, etc. There was no actual controversy between Merritt and Caldwell, and there has never been any dispute about his rights. He claims under Merritt, and his claim will stand or fall with Merritt's claim. It is therefore unnecessary to go into further particulars.

Plaintiff Cahill's second supplemental petition, filed April 21, 1897, demurred on several grounds to the respective claims for improvements, pleaded specially the Brown lease of 30 15-100 acres, that in consideration of the ratification of said lease by plaintiff, Benson, in writing, abandoned all claim for improvements thereon, except his claim for fencing the same, digging a well, and erecting a tenant house, the balance of the improvements having been made by Brown in payment of his rent. Plaintiff also alleged other matters not material to this appeal.

The pleadings of other parties are immaterial on this appeal, no question arising thereunder. George Brown and Isaac Benson, who joined in the claim for improvements on the first trial, made no claim at the last trial.

On April 22, 1897, all of plaintiff's demurrers were overruled, except the demurrer to C. H. Benson's claim for damages for sequestration, which was sustained, and upon trial before a jury a verdict was rendered, as follows:    For C. H. Benson, $2174 for improvements on 171½ acres of land claimed by him, valued without improvements at $3000; for R. N. Merritt, $635 for improvements on the 50 acres bought from J. T. Flowers, valued without improvements at $850; for R. N. Merritt, $479 for improvements on his original 50 acres, valued without improvements at $850.   Against T. K. Flowers on his claim for improvements, and allowing plaintiff nothing for rents or use and occupation.

The verdict also disposed of the other parties and issues under peremptory instructions, as to which no questions arise on this appeal.

The statutory judgment was rendered on this verdict, unless and except on the question of costs.   Notwithstanding plaintiff recovered judgment for the land, defendants R. N. Merritt and C. H. Benson contended that on the verdict they were not liable for costs incurred since the filing of the mandate from this court, while plaintiff contended the contrary.   To settle the matter, plaintiff filed a motion that judgment be rendered against Benson and Merritt for costs.   This motion was denied, and the court ordered that all costs incurred since the filing of the mandate by or on behalf of Benson and Merritt be taxed against plaintiff.   Judgment was entered accordingly.   Plaintiff's motion for a new trial was overruled, appeal duly perfected, and statement of facts and assignments of error duly filed.

Statement of the issues and evidence:   On this appeal the judgment of the court below is complained of in the following particulars:

1.  In allowing any compensation whatever for improvements to Benson and Merritt.

2.  In the amount of their respective recoveries.

3.  In the denial of all compensation to plaintiff for use and occupation.

4.  In taxing any of the costs against plaintiff.

*Opinion.*—The first, second, third, sixth, and seventh assignments of error are grouped, and propositions propounded under them.   The assignments are as follows:

(1) "The court erred in refusing to give to the jury the first special charge requested by plaintiff, that under the undisputed evidence in this case the defendants C. H. Benson, R. N. Merritt, and T. K. Flowers were not and are not possessors in good faith, and to therefore find against them on their respective claims for improvements."

(2) "The court erred in submitting to the jury the right of C. H. Benson to recover for improvements, because under the undisputed evidence he was not a possessor in good faith."

(3) "The court erred in submitting to the jury the right of R. N.

Merritt to recover for improvements, because under the undisputed evidence he was not a possessor in good faith."

(6) "The court erred in overruling plaintiff's motion for a new trial on the twelfth ground therein stated, to wit: The verdict of the jury is contrary to the law and the evidence, and the overwhelming weight of the evidence, in this, that the undisputed evidence, and the overwhelming weight of the evidence establishes that the defendant C. H. Benson was not a possessor or improver in good faith."

(7) "The court erred in overruling plaintiff's motion for a new trial on the thirteenth ground therein stated, to wit: The verdict of the jury is contrary to the law and the charge of the court, and the undisputed evidence, and the overwhelming weight of the evidence, in this, that the undisputed evidence, and the overwhelming weight of the evidence establishes that the defendant R. N. Merritt was not a possessor or improver in good faith."

1. It is contended by appellant that under the undisputed evidence C. H. Benson, R. N. Merritt, and T. K. Flowers were not possessors in good faith, and that the court should have given a peremptory instruction against their claims for improvements made in good faith. On the other hand, appellees maintain that their claim for improvements in good faith presented an issue of fact, upon which there was evidence sufficient to require its submission to the jury for determination.

It is quite clear that the pleas of improvements in good faith, by the respective defendants, raised issues of fact which the court was compelled to submit to the decision of the jury, if there was any evidence, in legal contemplation, tending to establish such issues. Our Supreme Court has held that the question of whether there is any evidence is for the judge to decide, and therefore is a question of law; while the question whether the evidence is sufficient to establish a given fact is a question of fact to be determined by the jury. Choate v. Railway, 90 Texas, 82.

The Supreme Court of the United States in the case of Irrigation Co. v. Garland, 164 U. S., 17, holds that the question whether there is any evidence tending to establish a fact is a question of fact, and that as the jurisdiction of that court in such cases is confined to questions of law, it can not go behind the findings of fact by the trial court.

It is our duty to follow the decisions of the Supreme Court of our State in construing the laws of this State, and there is no occasion for us to discuss the respective merits of these divergent decisions rendered by the two distinguished courts. In the later case of Joske v. Irvine, decided by our Supreme Court March 21, 1898, and not yet officially reported, the court discussed the meaning of the expression *any evidence* as used in the former decisions, and held that while there may be some evidence tending to establish an issue, yet if its probative effect is so weak that it only raises a surmise or suspicion, in legal contemplation, it falls short of being *any* evidence, and it is the duty of the court to decide the issue. We understand the holding to be, that if the evidence is not of sufficient directness and force to form the basis of a reasonable

conclusion, the court should decide the issue; but if there is sufficient evidence to lead a reasonable mind to a conclusion, it is for the jury. In the light of these decisions upon the extent and limit of the judge's authority, we will consider the contention that the issue of improvements in good faith should have been taken from the jury.

The evidence of title, admitted only upon the issue of improvements in good faith, was as follows:

(1) On November 2, 1850, a patent was issued to James M. Hamilton for one-third of a league of land.

(2) James M. Hamilton having died intestate, on March 1, 1852, Robert S. Hamilton applied to the County Court of Red River County for letters of administration, which were granted on April 1, 1852, and he duly qualified as administrator. On February 28, 1853, on the petition of Adam Sullivan, the court decreed that he was entitled to one-third of said James M. Hamilton survey for his locative interest, under a written contract with James M. Hamilton, decreeing a partition, and appointing commissioners. Under regular proceedings, one-third of the survey—492 acres—was set aside to Adam Sullivan by metes and bounds, and two-thirds in like manner to the Hamilton heirs, and the administrator was directed to make a deed to Sullivan. The judgment, however, in express terms vested the title in Sullivan, so that no administrator's deed was necessary, as held on the former appeal.

(3) On September 16, 1854, the administrator executed a deed to Sullivan, which was recorded in Dallas County December 16, 1859.

(4) On November 25, 1859, Adam Sullivan and wife executed to their daughter, Adeline Geiger, wife of J. C. Geiger, a deed of gift for the 300 acres in controversy in this suit, a part of said locative interest. This deed was recorded in Dallas County December 16, 1859.

(5) On February 20, 1872, T. C. Sadler recovered judgment in the District Court of Kaufman County (on appeal from justice court) against J. C. Geiger and Adeline Geiger for $65.44, and costs, decreeing that the debt was a just charge against Adeline Geiger's separate estate, and ordering execution to be levied—first, upon the community property of defendants, and if that be insufficient, then upon the separate property of Adeline Geiger. Executions were issued on this judgment April 5, 1872, July 15, 1872, and June 10, 1873, and returned nulla bona.

(6) On February 2, 1874, a pluries execution on this judgment was issued to Dallas County, and levied February 21, 1874, by the sheriff on said 300 acres of land, and on April 7, 1874, the land was regularly sold by the sheriff to plaintiff, Patrick Cahill, for $150. Plaintiff complied with his bid, and received a sheriff's deed, duly acknowledged, which was recorded in Dallas County, April 8, 1874.

The above is plaintiff's title. He paid the taxes upon the property from the date of his purchase in 1874 to the institution of this suit in 1894.

(7) Defendants claim under the heirs of Adeline Geiger, who died in

1876, leaving five children and her husband surviving. Afterward two children died, leaving as sole survivors D. C. (or Albert) Geiger and John Geiger, sons, Mattie Walter, daughter (wife of Leo Walter), and their father, J. C. Geiger.

(8) On November 17, 1890, John Geiger, for a recited consideration of one dollar and love and affection, executed a quitclaim deed to his sister, Mattie Walter, for "all right, title, claim, and interest I may have as heir of my mother, Adeline Geiger, in and to" the said 300 acres of land. Shortly afterward John Geiger died.

(9) On February 9, 1891, Leo Walter and wife, Mattie Walter, Albert (D. C.) Geiger, and J. C. Geiger, by Charles F. Clint, attorney, brought suit of trespass to try title against Patrick Cahill in the District Court of Dallas County for said 300 acres of land.

(10) On February 13, 1891, said Leo Walter and wife, for themselves and as agents and attorneys in fact for Albert (D. C.) Geiger, for a re-cited consideration of one dollar and other valuable considerations, made a deed to Charles F. Clint of a "one-half undivided interest in fee of all our interest in and to" said 300 acres. This deed has never been recorded. The real consideration of this deed was Charles F. Clint's attorney's fee in the suit mentioned in the last preceding paragraph. "He was to have half the land if he gained it from Patrick Cahill. He was employed to bring the suit against Patrick Cahill. The agreement was made when he was employed. The deed was executed afterward."

(11) On February 26, 1891, J. C. Geiger executed to Mattie Walter a deed to the 300 acres, which was recorded on April 1, 1891. Recited consideration one dollar and other valuable considerations.

(12) On May 20, 1891, D. C. (Albert) Geiger executed to Mattie Walter a deed to "all my right, title, and interest in fee in and to" said 300 acres. Recited consideration one dollar and other valuable considerations. Deed recorded July 8, 1891.

(13) In reference to these deeds, Mattie Walter, a witness for defendants, testified without contradiction, as follows: "My brothers and father deeded me their interest. They gave it to me. They said they did not care about being bothered with a law suit. That was their reason for deeding it to me. We knew then that Patrick Cahill had a sheriff's deed. I heard of the sheriff's sale some time after it occurred. * * * I was never in possession of the land nor did I pay any taxes on it until I started the law suit. * * * My father and brothers lived some distance out west. They said they had no time, and could not come to Dallas to look after the land or attend to a law suit, so they deeded the land to me."

(14) October 24, 1891, Chas. F. Clint, for a recited consideration of $1000, executed a deed to T. K. Flowers, R. N. Merritt, and J. T. Flowers for an undivided half interest in said 300 acres. Deed recorded November 19, 1891. The suit of Walters et al. v. Cahill was still pending.

(15) On December 10, 1892, while said suit of Walters et al. v. Cahill was still pending, Leo Walter and wife, and Mattie Walter, and Chas. F. Clint executed a deed to C. H. Benson for "all our right, title, and interest" in said 300 acres. Deed recorded January 10, 1893. Recited consideration $750 paid, and $1050 in notes.

(16) March 21, 1893, and less than one year prior to the institution of the present suit, on January 19, 1894, said suit of Walters et al. v. Cahill was dismissed by plaintiffs without service of citation on Cahill or appearance by him. Citation had issued March 25, 1891, returned April 1, 1891, defendant not found in Dallas County.

(17) At a date not precisely shown, and not material, there was a parol partition of the 300 acres, C. H. Benson receiving the northwest 150 acres, and T. K. Flowers, J. T. Flowers, and R. N. Merritt the southeast 150 acres. This 150 acres was in turn partitioned by deed on March 1, 1893, J. T. Flowers receiving the southwest 50 acres, R. N. Merritt the middle 50 acres, and T. K. Flowers the northeast 50 acres. Thus the 300 acres was completely partitioned, each holding in severalty from this time.

(18) March 1, 1893 (the same date as the partition), T. K. Flowers conveyed to C. H. Benson "all my right, title, interest in and to 21½ acres," a part of the 50 acres allotted to T. K. Flowers in said partition, and the same day conveyed the balance of his interest in said 50 acres to James Baker, a defendant in this suit, but not interested in this appeal. Said deed to Benson has not been recorded.

(19) November 8, 1893, J. T. Flowers and wife deeded to R. N. Merritt the 50 acres received by said Flowers in said partition for $1000 in vendor's lien notes, which were subsequently sold to intervener, Volney Caldwell. This deed has not been recorded.

As a result of these transactions C. H. Benson held 17½ acres, R. N. Merritt 100 acres, of which 50 acres was subject to said vendor's lien notes, and Baker the balance. Benson, however, never acquired possession of all of said 17½ acres, an improved tract of 14.6 acres being in possession of Joel Wood, as will subsequently appear. J. T. and T. K. Flowers ceased to have any interest in the land whatever. This was the status of affairs when plaintiff brought suit January 19, 1894, and this status, as among defendants, remains unchanged.

On the question of notice and good faith, appellant's counsel in their brief give about this summary of the evidence:

The parol evidence on the question of good faith was exceedingly voluminous. The testimony of defendants' witnesses may, however, be fully and fairly summarized as tending to prove the following facts:

That Mattie Walter, having determined to undertake to recover the land from Cahill, and her father and brothers, the other heirs, not wanting to be "bothered with a law suit," they quitclaimed their supposed interests to her, she paying nothing for the deeds; that they then knew that Cahill had a deed; she had heard of the sale to Cahill "sometime after it occurred;" she had never been in possession of the land nor had she

paid any taxes until she "started the law suit;" that she employed Chas. F. Clint to bring the suit on a contingent fee of one-half; that this was the sole consideration of the deed to Clint, which appears to have never been recorded; that Clint accordingly brought the suit of Walters et al. v. Cahill, already mentioned; that Clint was a lawyer of good personal and professional standing; that he was the regular attorney of T. K. Flowers, and both C. H. Benson and T. K. Flowers had complete confidence in his integrity and capacity; that Flowers having heard that Clint had the land for sale, entered into negotiations with him which resulted in the purchase of Clint's supposed half interest, the deed being made jointly to T. K. Flowers, his son J. T. Flowers, and his son-in-law R. N. Merritt; that T. K. Flowers represented his son and son-in-law, who wanted the land for their homes; that like negotiations resulted in the sale of the other supposed half interest to C. H. Benson; that the land was generally known as the "Geiger land," but Cahill's claim of ownership was a matter of general notoriety, and was known to both Benson and Flowers; but that Cahill's claim was generally regarded as "mythical;" that Flowers knew that Cahill had had the land surveyed in 1878, and understood that he surveyed it because he claimed to own it; that neither Benson nor Flowers had any abstract of title, neither of them inquired who had been paying taxes upon the land, and neither of them obtained an opinion of any lawyer on the title except the verbal opinion of Clint, from whom they were purchasing, and they paid him nothing for his opinion; that Benson was introduced to Clint through Kirkpatrick & Skiles, real estate agents of good standing and character, who told Benson that they thought the title was good, but who referred Benson to Clint for particulars, and did not pretend to be familiar with the title, or to be judges of land titles; that Clint told both Benson and Flowers "all he knew" about the Cahill "claim." Whether or not he told them of the pending suit is left in some doubt. No witness testified positively on the question. Clint told both Benson and Flowers that he had investigated the Cahill "claim," and that in his opinion it was absolutely groundless; that he, however, advised them to have the title examined by another lawyer; that they declined to do so on the ground that they had as much confidence in his opinion as they would have in any other lawyer's; that defendants are all farmers, inexperienced in land titles; that they purchased the land relying upon Clint's opinion that the title was good. Clint agreed to protect Flowers against the Cahill claim at his (Clint's) expense. It does not appear whether this agreement was written or verbal. The following written agreement was entered into between Benson and Clint:

"*The State of Texas, County of Dallas.*—Know all men by these presents that we, Charles F. Clint and C. H. Benson, both of the foregoing county and State, witnesseth: That the said Clint, for a consideration hereinafter to be mentioned, does hereby agree to defend, free of all charge, any and all law suits that may be brought against the 150 acres

of the one-half undivided interest in the 300 acres Geiger tract of land, which may at any time be brought against it by any one. For and in consideration of which, I, the said Benson, hereby agree to pay to the said Clint ($675) six hundred and seventy-five dollars of the purchase money which I this day agreed to pay to Leo Walters and wife and the said Clint for the said land.

"I understand about the Cahill claim to said land, and buy said land with a knowledge of it, and agree to pay said money aforesaid notwithstanding it, provided the said Clint will defend as aforesaid.

"Witness our hands, this 10th day of December, 1892.

"CHAS. F. CLINT,<br>"C. H. BENSON."

Under his agreement with Benson and Flowers, Clint was to be responsible for the purchase money to them, and for all they would have to pay in fees and costs in litigating the Cahill title.

In accordance with these agreements, Clint and Mrs. Walters have defended this suit, and have paid back the purchase money of the land, in part, and have given security for the repayment of the balance.

Merritt testified, that when he purchased he knew nothing of the Cahill "claim." He acted, however, through Flowers, who did know of it, and he made no investigation of the title. Cahill's residence was unknown, and though Clint tried to find him to serve with citation, he was unable to do so.

On behalf of plaintiff, there was testimony that as long as twenty years ago, Cahill had put up notices on the land offering a reward for the apprehension of timber cutters; that he had the land surveyed in 1878; that his claim of ownership was a matter of neighborhood notoriety; that the land was commonly called the "Cahill land" as well as the "Geiger land;" that Cahill's claim was not generally regarded as fictitious; that Cahill had put trespassers off the land. In addition to this the record title heretofore set forth was read in evidence. There is no evidence that Cahill did anything, directly or indirectly, to mislead defendants.

It is but just to say that this statement does not put the defendants' evidence on the issue of good faith as strong as the statement of facts would warrant. The uncontroverted testimony showed that Chas. F. Clint was a lawyer of high standing and a man of unquestioned integrity. He investigated the title to the land and became firmly convinced that the Cahill claim was invalid and worthless. He advised the purchasers in the strongest and most positive manner that the Cahill claim was invalid and that the title they would get was good and perfectly safe. The appellees reposed entire confidence in the ability and learning of said Clint as a lawyer and in his integrity as a man, and confidently believed in the correctness of his opinion that the Cahill claim was worthless and the title which they took was perfectly good. Under these conditions appellees purchased the land and made the improvements. Can it be

said, as a matter of law, that there was no evidence tending to establish their claim for improvements in good faith? Our statute provides for compensation to *possessors in good faith* who have made permanent and valuable improvements upon the land of another. Rev. Stats., arts. 5277, 5278.

In Louder v. Schluter, 78 Texas, 107, it is said: "Good faith is the question, and it is a question of fact to be determined by the jury under the law. There may be title in another superior to that of defendant, and such title may be known to him, yet he might believe and have good grounds to believe in his own claim to the property.

"One may be a possessor in good faith, who knew the title of another, if he has reasonable and strong grounds to believe in the soundness of his own title. * * * As a general rule, to constitute one a possessor in good faith, he must not only believe that he is the true owner, have reasonable grounds for the belief, but he must be ignorant that his title is contested by one having a better right. But there may be cases when, though aware of the adverse claim, the possessor may have reasonable and strong grounds to believe such claim to be destitute of any just or legal foundation; and so be in possession in good faith." Gaither v. Hanrick, 69 Texas, 98.

In Sartain v. Hamilton, 12 Texas, 222, Mr. Chief Justice Hemphill, discussing this question says: "The suggestion of improvements by defendant and his claim to them, is founded upon the statutes allowing compensation for permanent and valuable improvements to possessors who hold in good faith. It becomes important, then, to ascertain what is a settlement in good faith; and as this is not defined by statute, we must refer to other sources for its definition.

"In the Institutes of Asso & Manuel, 1 White, 92, good faith is said to consist in the possessor's believing that the person from whom he received the thing had a right to alien or transfer it. By the Civil Code of Louisiana, article 495, a bona fide possessor is described to be one who possesses as owner by virtue of an act sufficient in terms to transfer property, the defects of which he was ignorant of; he ceases to be a bona fide possessor from the moment these defects are made known to him or are declared to him by a suit for the recovery of the same by the proprietor.

"Mr. Sedgwick, in his learned treatise on the Measure of Damages, defines a bona fide possessor to be one who not only supposes himself to be the true owner of the land, but who is ignorant that his title is contested by any person claiming a better right to it.

"This definition is supported by the authority to which he refers, viz, Bright v. Boyd, 1 Story R., 478; but if it be construed to restrict the quality of good faith to cases only where the tenant is ignorant that his title is contested by one who claims the land under a better right, I apprehend that it does not embrace all the elements which may constitute good faith, and that it would fail to secure rights which our statutes intended to protect. No doubt the definition, so far as it goes,

is sound, and that a possessor holds in good faith who is justifiably ignorant of the rights of the true owner. But he may also have good faith where he makes an innocent mistake in point of law, for instance, as to the construction of a demise, the due execution of a power, and the like, where, though aware of the opposing claim, he may have entered in full confidence of the validity of his title." Adams on Eq., p. 386, referring to B. N. P., p. 88. "Of course, when the tenant is cognizant of the claims of another, he must have reasonable and strong grounds to believe in the soundness of his own title, otherwise he can not claim as a holder in good faith." See also the following cases: Dorn v. Dunham, 24 Texas, 380; French v. Grenet, 57 Texas, 278, 279; Elam v. Parkhill, 60 Texas, 581; House v. Stone, 64 Texas, 685; Berry v. Donley, 26 Texas, 736; Van Zandt v. Brantley, 42 S. W. Rep., 617.

Now let us apply these principles to the facts of this case. Appellees knew of the Cahill claim of title; the Cahill title came through a judgment against J. C. Geiger and his wife, Adeline Geiger, and a sheriff's deed thereunder. The property was known to be the separate property of Adeline Geiger, and if the sheriff's sale to Cahill had not passed the title, appellees would have had a perfect chain of title. The attorney, Clint, after examination into the title, believed that the judgment against Adeline Geiger was void, because it was for a community debt; and he also believed that there were other fatal defects in Cahill's muniments of title. He advised the appellees to this effect, and they, having full confidence in his judgment and honesty, bought the land believing that they were getting the superior and good title to the land. Does this evidence not tend to prove that appellees were possessors in good faith? To our minds there can be but one answer, and that in the affirmative. The court, therefore, did not err in submitting the question to the decision of the jury.

The second and third assignments assert that the court erred in submitting the issue of improvements in good faith as to C. H. Benson and R. N. Merritt, respectively, because under the undisputed evidence they were not possessors in good faith. The record does not sustain either of these assignments. There is evidence tending to show that Benson was a possessor in good faith, and that, as such, he placed permanent and valuable improvements on the land.

As to Merritt, the evidence showed that his father-in-law, T. K. Flowers, bought the land for himself, his son, and Merritt under the circumstances heretofore related as to good faith, and the land was afterward divided between them. Merritt at the time did not know of the Cahill claim, though Flowers, who bought for him, did. Merritt was certainly in no worse position than Flowers, who did the buying. There was evidence tending to show Merritt's good faith, and improvements made by him as a good faith possessor.

The sixth and seventh assignments of error attack the verdict, as to Benson and Merritt, respectively, upon the ground that the evidence established that they were not possessors in good faith.

These assignments are not sustained by the record. We have heretofore noticed the evidence upon this issue, and we need not discuss it further. We think the evidence warranted the jury in reaching the conclusion that appellees, and each of them, were possessors in good faith; and in deference to the verdict rendered by the jury, we here find that they were possessors in good faith.

Appellant's fourth and fifth assignments are as follows:

(4) "The court erred in refusing to charge the jury, as requested in plaintiff's second special charge, that the law does not protect, as an improver in good faith, a defendant who, knowing of an adverse title, deliberately takes his chances of defeating it, however strong his belief may be that he will succeed in doing so, when he buys, expecting that he will probably have a law suit about the title to the land with adverse claimant; and that if, under the evidence, the defendants, or either or any of them, were not possessors in good faith, as thus defined, then to find against them on their claims for improvements."

(5) "The court erred in refusing to charge the jury, as requested by plaintiff's second special charge, that one who goes into possession of land and makes improvements thereon is bound to use reasonable diligence in the investigation of his title; and when he has failed to do so, and by the exercise of such reasonable diligence he would have certainly discovered that his title was bad, or very doubtful, he can not recover as an improver in good faith."

The court charged the jury as follows: "By the term 'good faith' as used in the above section of this charge, in law, is meant the belief on defendants' part that they were the owners of the respective parts claimed by them of said land when they improved the same; that they have had such reasonable ground for such belief as a man of ordinary prudence would have regarded as sufficient; and if they or either of them and those under whom they claim, at the time they made improvements on the respective portions of said land claimed by them, knew of plaintiff's claim to said land, then they must have had good and strong ground for believing that his claim was destitute of just or legal foundation."

The court correctly charged the law of the case, and did not err in refusing to give the special charges requested.

Appellant's eighth and ninth assignments relate to the refusal of special charges upon the subject of the recovery by plaintiff of rents for use and occupation as an offset to defendants' claim for improvements made in good faith. The evidence showed that the lands were in a wild and uncultivated state when appellees went into possession and made the improvements, and that the land had no rental value apart from the improvements. On the former appeal (37 Southwestern Reporter, 1088) we held that rents could not be recovered under such conditions, referring to articles 4814, 4815, Revised Statutes. We are of the opinion that we there placed the proper construction upon these statutory provisions—now numbered 5278 and 5279. Our Supreme Court seems to so understand them, when discussing them in Bitner v. Land Com-

pany, 67 Texas, 341. As to the constitutionality of these statutes, see Van Valkenburg v. Ruby, 68 Texas, 143. The court properly refused the charges asked.

The eleventh and twelfth assignments are next presented, and are:

(11) "The court erred in refusing to instruct the jury to find for plaintiff and against defendants C. H. Benson, T. K. Flowers, and R. N. Merritt as to such tracts of land as said defendants were never in possession of, or improved, as requested in plaintiff's fourth special charge."

(12). "The court erred in refusing to instruct the jury that in no event should they allow C. H. Benson, T. K. Flowers, and R. N. Merritt anything for the improvements on the several portions of land which neither of said defendants were ever in possession of, as requested in plaintiff's sixth special charge."

These assignments are not well taken. The court, in effect, charged the jury that no recovery for improvements could be had unless such improvements were made in good faith as explained under possession a year prior to the bringing of this suit. The uncontroverted evidence showed that Benson was never in possession of the 14.6 acres Wood tract, and made no improvements on it, and it is clear that there was no recovery by the defendants Flowers and Merritt for improvements on the Baker tracts. It is claimed that under the general charge the jury might have given Benson compensation for the improvements on the Wood 14.6 tract, as it was embraced in his field notes. We do not find it manifest from the record that the 14.6 acres were embraced in Benson's field notes, and there is no proof to that effect. Under the charge, as applied to the evidence, we can not see how the jury could have given Benson the benefit of improvements on land that he never had possession of and which he did not improve, and we see no evidence in the record that this was done.

The thirteenth assignment is as follows: "The court erred in refusing to instruct the jury that in no event should they allow any defendant anything for the improvements made on the tract of 30 15-100 acres included in the 150 acres described in the answer of C. H. Benson, except for tenant house, fencing, and well, as the balance of the improvements on said tract of 30 15-100 acres were placed thereon by George Brown, and C. H. Benson has not and never had any interest in the same. And in estimating the present value of the land, without reference to or exclusive of the improvements placed thereon by the defendants, to include in such present value all improvements placed thereon by George Brown, including clearing, breaking, and cultivation of the same, all as requested in plaintiff's eighth special charge."

The court charged the jury: "If you find for the defendants, or either of them, you will not consider or include improvements made since this suit was brought on January 19, 1894, but in so far as any improvements made since this suit was filed have added to the present value of the land, you will include the value of the same in your findings of the

value of the premises without improvements made prior to the institution of this suit."

Benson's counsel in their brief make this further appropriate reply to this assignment, which we adopt: "It is not to be presumed under this charge that the jury gave Benson the benefit of the improvements on the Brown land, if any improvements there were on the same, beyond the house, well, and fencing. It was agreed between the plaintiff and Benson that Benson's claim for improvements on the Brown land should be limited to the house, well, and fencing; and it was shown that the Brown contract with Benson to improve the land in consideration of holding the same rent free had been ratified by the plaintiff. And there was no evidence as to any improvements on said 30 15-100 acres beyond the house, well and fencing; and there is no evidence to justify the contention that any improvement on this land was included in the finding for Benson other than the house, well, and fencing."

The sixteenth and seventeenth assignments attack the verdict as excessive. These assignments can not be sustained. The evidence justified the jury in awarding the defendants for improvements made in good faith the respective sums named in the verdict, and in support of the verdict we find the value of the improvements to be as therein stated.

The fourteenth assignment is next urged. It is: "The court erred in refusing the fifth special charge requested by plaintiff, as follows: 'You are instructed to find against the defendants the reasonable rental value of such portions of the property described in their respective answers as were cleared and put into cultivation since the institution of this suit on January 19, 1894, from the time such tracts of land respectively acquired a rental value, subsequent to the institution of this suit, as aforesaid, until the 5th day of June, 1895, but you will find against each defendant for the rental value of only such tract or tracts of land as each of them has in fact cleared and put into cultivation since the institution of this suit, as aforesaid, under the instructions contained in this special charge, unless under other instructions you find against defendants for the rental value of all the land occupied by them respectively.' "

In our opinion, the court did not err in refusing this special charge. As has been heretofore stated, the lands had no rental value exclusive of the improvements placed thereon by defendants, and, aside from the statute, it would be inequitable for the plaintiff to receive the benefit of such improvements as were placed upon the land after the institution of the suit by recovering them, as he had done by virtue of the judgment for the land, and at the same time recover the value of the use and occupation of the land, which value was created by such improvements. Smith v. Bell, 25 S. W. Rep., 752.

Fifteenth assignment: "The court erred in submitting to the jury the right of T. K. Flowers to recover for improvements, because the undisputed evidence shows that said T. K. Flowers had parted with all interest or claim of title to the land prior to the institution of this suit,

and the submission of such charge was calculated to confuse and mislead the jury, and probably did so."

T. K. Flowers recovered nothing in the suit, and we think it manifest that the jury was not misled by the charge.

Eighteenth assignment: "The court erred in submitting to the jury the right of the defendant C. H. Benson to recover jointly for the improvements placed by him on the two tracts of land described in his answer, and in not instructing the jury to make a separate finding as to such two tracts, in the event they should find in favor of the said C. H. Benson on his separate claims for improvements."

Appellees' counsel correctly answer this assignment, as follows: "There was no error in the court's submitting to the jury the right of appellee Benson to recover for the improvements claimed by him on the land described in his answer, nor in failing to instruct the jury to make a separate finding upon each of the tracts described; for that such charge was not required by statute, and the two tracts of land described comprised the land claimed by appellee Benson and formed only one inclosed tract.

"The evidence showed that the entire 171½ acres comprised one tract of land, held and claimed by the appellee Benson in a body, and there was no requested charge by the appellant in reference to a separate finding upon each tract described."

The nineteenth assignment raises the same question, in a different way, as the eighteenth, and is not well taken.

The twentieth and twenty-first assignments, raising the question of limitations, present no error in the action of the court.

Twenty-second assignment: "The court erred in adjudging that defendants C. H. Benson and R. N. Merritt recover of plaintiff all costs by them or in their behalf incurred since the filing of the mandate from the Court of Civil Appeals, and in overruling the motion of plaintiff to tax said costs against said defendants, in that plaintiff having recovered judgment for the land sued for, is entitled to judgment for costs, there being no cause apparent or stated on the record as required by law for adjudging the costs otherwise."

We do not think the court erred in this matter. The issue of title was settled by the affirmance of the former judgment, and the judgment was reversed only upon the issue of improvements in good faith. There was nothing to settle in this case but the defendants' claim for improvements made in good faith and the plaintiff's claim for the rents; and it was held on the former appeal that plaintiff was not entitled to recover rents. The defendants recovered for their improvements, and they were practically plaintiffs upon this issue, and the appellant contesting the issue was practically the defendant. Under these conditions, we think the court properly adjudged that appellant should pay the costs accruing after the filing of the mandate from this court.

The tenth and last assignment presented attacks the constitutionality of the statutes authorizing the recovery for improvements made in good

faith. It is urged that these statutes are in conflict with the Constitution of the United States, and also with the Constitution of this State. This position is not well taken, under the decisions of our Supreme Court. Scott v. Mather, 14 Texas, 235; Saunders v. Wilson, 19 Texas, 194; Van Valkenburg v. Ruby, 68 Texas, 142, 143.

None of the assignments present reversible error.

The evidence justified the finding that appellees were possessors in good faith, and made their improvements as such, and warranted the amounts awarded as their value. In support of the verdict, we find that those facts were established by the evidence. We further find that the land had no value for use and occupation exclusive of the improvements placed thereon by appellees.

The judgment is affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

#### Delivered May 7, 1898.

We have given very careful consideration to the motion for rehearing, and find no cause to change our decision as to the disposition made of the case. In the opinion rendered, in passing upon the eleventh and twelfth assignments of error, we say we do not find it manifest from the record that the 14.6 acres Wood tract was embraced in the C. H. Benson field notes, as set out in his pleadings, and there was no proof that it was embraced therein. By considering such field notes with the map introduced in evidence, we find that the Wood tract is embraced in Benson's field notes and is covered by the description contained in the judgment. Upon the trial, however, Benson expressly disclaimed any claim upon the Wood tract, and it was shown that he was never in possession of it. While it appears that there were some improvements upon the Wood tract, Benson had no connection therewith, and there was no evidence showing the extent and value of such improvements. The evidence showing the nature, extent, and value of Benson's improvements justified the amount awarded him by the jury, and we can find no reasonable ground to justify the conclusion that the jury gave him compensation for the improvements on the Wood tract. Judgment was not asked to be corrected in this respect in the court below, there is no assignment here complaining that the judgment goes further than is authorized by the verdict, and there is nothing in the form of the verdict which would indicate that the improvements upon the Wood tract entered into it.

The contention is, that the court refused to expressly exclude this tract from the consideration of the jury by special charge asked, and that the size of the verdict makes it clear that this action was error.

We think it clear from the record that the general charge, under the circumstances, was sufficient, and that no injury resulted from the fail-

ure to specially and expressly exclude the improvements upon the Wood tract from the consideration of the jury.

The motion for rehearing is overruled.

*Overruled.*

Writ of error refused.